USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/25/17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AURA MARTINEZ, as Natural Guardian
o/b/o M.G., an Infant,

Plaintiff,

- against -

COMMISIONER OF SOCIAL SECURITY, et al.,

Defendants.

**REPORT AND**
**RECOMMENDATION**

**16-CV-1153 (PKC) (RLE)**

To the HONORABLE P. KEVIN CASTEL, U.S.D.J.:

## I. INTRODUCTION

Plaintiff Aura Martinez ("Martinez") commenced this action on behalf of her minor child ("M.G."), under the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI") benefits. (Doc. No. 2.) Martinez argues in her Complaint that the decision of the Administrative Law Judge ("the ALJ") was erroneous and not based on substantial evidence. (*Id.* at 2.)

On May 31, 2016, the Commissioner filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asking the Court to affirm the Commissioner's decision and to dismiss the Complaint. (Def. Mot. for J. on the Pleadings ("Def.'s Mem."), Doc. Nos. 7-8.) Martinez retained counsel, (Doc. No. 12.), and filed a motion in response to the Commissioner's motion for judgment on the pleadings. (Pl. Mot. For J. on the Pleadings ("Pl.'s Mem."), Doc. No. 16.) In her motion, Martinez argues that the Commissioner's decision is not legally correct and not supported by substantial evidence. *Id.* For the reasons that follow, I recommend that the Commissioner's motion be **GRANTED.**

## II. BACKGROUND

### A.      Procedural History

On June 12, 2012, Martinez filed an application for Supplemental Security Income ("SSI") on behalf of M.G. with the Social Security Administration (the "SSA"). (Tr. of Admin. Proceedings ("Tr.") at 269-79.) Martinez alleged disability as of October 31, 2007, because of epilepsy, ADHD, and asthma. *Id.* The application was denied on May 2, 2014. (*Id.* at 42-58.) Martinez appeared before ALJ Zachary S. Weiss ("ALJ Weiss") initially on July 16, 2013. The hearing was adjourned so that Martinez could obtain legal representation. (*Id.* at 37-41.) The hearing resumed on April 10, 2014, where Martinez and her attorney appeared before ALJ Weiss. (*Id.* at 42-58.) ALJ Weiss issued an unfavorable decision on May 2, 2014, finding that M.G. was not disabled within the meaning of the Act, and therefore not eligible for SSI. (*Id.* at 13-35.) Martinez requested review of the ALJ's decision by the Appeals Council. (*Id.* at 1-6.) The Appeals Council denied Martinez's request for review on December 29, 2015, making the ALJ's decision the final decision of the Commissioner. *Id.* Martinez filed the Complaint in this case on February 11, 2016. (Doc. No. 2.)

### B.      The ALJ Hearing and Decision

#### 1.      Administrative Hearing Testimony

Martinez testified that M.G. started having seizures in 2007 and received treatment from her primary physician. (Tr. at 40.) Martinez also said that M.G. recently had two small seizures and would be admitted to Montefiore the next day. *Id.* The hearing was adjourned for Martinez to obtain counsel. When the hearing resumed on April 10, 2014, Martinez testified that M.G. was not doing very well in school. (*Id.* at 53.) M.G. was having headaches two or three times per week, with one headache lasting half an hour. *Id.* About eight months earlier, M.G. had a

headache that lasted up to three days. (Tr. at 53.) M.G. takes Motrin for headaches, and six pills in the morning and six in the afternoon for seizures. (*Id.* at 54.) M.G. is being evaluated at school to see if she should be placed in special education. *Id.* When asked about M.G.'s loss of concentration, Martinez testified that M.G. loses concentration while people are speaking to her. *Id.*

### 2.   Medical Evidence

#### a.   Dr. Joan Budd, Treating Physician

M.G. had a seizure on March 12, 2012, and was subsequently seen by her primary care physician, Dr. Joan Budd, on March 15, 2012. (*Id.* at 500.) At this appointment, Martinez reported that M.G. had poor focus at school sometimes and now had poor grades. *Id.* Martinez noted that except for the seizures M.G. was in good health. *Id.* Dr. Budd referred M.G. to pediatric neurologist, Dr. Koshi Cherian. (*Id.* at 502.) Dr. Budd saw M.G. again on May 1, 2012, at which time she performed a well-child check-up and found that M.G.'s lungs were clear of auscultation, with no rhonoci, rales, or wheezing. (*Id.* at 495.) The results of M.G.'s check-up were largely normal, including no deformities in the chest wall and a regular heartrate and rhythm. *Id.* Dr. Budd found that M.G. was "alert and cooperative" and had an "age-appropriate attention span and level of motor activity." *Id.* Dr. Budd also noted that "there [were] no delays in gross motor, fine motor, language, or social development." *Id.*

#### b.   Dr. Koshi Cherian, Pediatric Neurologist

On March 19, 2012, Dr. Koshi Cherian met with M.G. for an epilepsy consultation. (*Id.* at 363.) Dr. Cherian had not seen M.G. since October 2007 for seizures. *Id.* Dr. Cherian noted that M.G. had not taken anti-epileptic medications since December 2007, and that it was unclear when M.G.'s last seizure had occurred. *Id.* Dr. Cherian wrote that Martinez was concerned

because the two recent seizures were accompanied by changes in behavior, such as staring, dancing, and moving with unresponsiveness and immediate memory loss. (Tr. at 363.) Dr. Cherian found M.G.'s psychiatric system "unmarkable." (*Id.* at 365.) Dr. Cherian saw M.G. again on April 10, 2012, for a follow-up visit, and noted that M.G.'s seizures had stopped and she had no problems with school or sleep. (*Id.* at 483.) The mental and physical examinations were also unmarkable. (*Id.* at 484-85.) Additionally, an MRI of M.G.'s brain was normal. (*Id.* at 474-75.)

On June 20, 2012, M.G. visited Dr. Cherian again. (*Id.* at 379.) No problems with school or sleep were reported and M.G had not had a seizure since March 23, 2012. *Id.* The examination was unmarkable and M.G. was responding well to Carbatrol, an anti-seizure medication. *Id.* On October 2, 2012, another follow-up visit was labeled as unmarkable. (*Id.* at 416-22.) M.G. was tolerating her dosage of Carbatrol well, although she still continued to complain of headaches. (*Id.* at 419.)

M.G. visited Dr. Cherian on January 23, 2013. M.G. was tolerating the Carbatrol well, but continued to complain of headaches three times per week. (*Id.* at 423.) Martinez reported that the headaches are relieved with Motrin. *Id.* Dr. Cherian noted, that it is unclear whether the headaches are occurring as frequently as Martinez claims, as Martinez did not bring M.G.'s headache diary. *Id.*

On June 4, 2013, Dr. Cherian saw M.G. again. (*Id.* at 411.) At this visit, Martinez noted that M.G. had been throwing her medication in the garbage and forgetting where she keeps her belongings. *Id.* Martinez stated that M.G. had two episodes of unresponsively staring for two minutes. *Id.* M.G. also sometimes did not hear her teacher. *Id.* Dr. Cherian decided to increase

the dosage of Carbatrol because the staring and lack of hearing are indicative of possible seizures. (Tr. at 413.)

During a follow-up visit on July 8, 2013, Dr. Cherian noted that M.G.'s headaches were occurring once per week, but not every week. (*Id.* at 451.) The headaches often occurred while M.G. was playing in the sun, and she had mild headaches when waking up. *Id.* Martinez also reported bedwetting one night per week and performing poorly in school. *Id.* Although M.G.'s physical examination results were normal, Dr. Cherian recommended evaluation in the Epilepsy Monitoring Unit. (*Id.* at 452-53.) Monitoring took place from July 18 to July 23, 2013, and failed to capture any medical events. (*Id.* at 931.) On July 15, 2013, Dr. Cherian suggested that M.G. complete psychological testing because of her poor school performance, and memory and emotional problems. (*Id.* at 430.)

### c.    Dr. Rehan Khan, Consultative Pediatric Examiner

Dr. Rehan Khan saw M.G. for a consultative examination on July 26, 2012. He found that M.G. had had no problems with asthma for the two years before the examination, and no "gross physical limitation to participate in educational, social, or recreational activities." (*Id.* at 395-400.)

### d.    Dr. David Mahoney, Consultative Psychiatric Examiner

Dr. David Mahoney saw M.G. on July 26, 2012. He found that M.G. could "attend to, follow, and understand age-appropriate directions, complete age-appropriate tasks, adequately maintain appropriate social behavior, and respond to change in the environment." (*Id.* at 392.) Dr. Mahoney also noted that M.G. could interact adequately with peers and adults. *Id.* He further noted that M.G. could dress, bathe, and groom herself, and helps her mother with household activities of daily living. *Id.* Dr. Mahoney found that M.G. was "generally well-

behaved with no psychiatric problems," but recommended she receive support in math. (Tr. at 392.) Dr. Mahoney noted that M.G.'s memory is intact and she is able to recall three out of three objects immediately, and three out of three objects after five minutes. (*Id.* at 391.) M.G. was also able to count backwards from 10 to 0, but when asked to subtract 12 from 20, she responded, "18." *Id.*

### e. Dr. J. Randall, Pediatric Consulting Examiner, and Dr. K. Prowda, Child Adolescent Psychiatrist

Between August 7 and August 14, 2012, Drs. J. Randall and K. Prowda reviewed M.G.'s medical records. (*Id.* at 59-67.) They found that M.G. has less than marked limitations in each domain of functioning, except for moving about and manipulating objects, for which they concluded that M.G. has no limitation. (*Id.* at 63-67.) In assessing M.G.'s ability to acquire and use information, Drs. Randall and Prowda noted that M.G. has no psychiatric history or outpatient treatment. (*Id.* at 63.) M.G.'s eye contact is appropriate, her speech is fluent and clear, and she has coherent and goal directed thought processes, although her concentration is mildly impaired. *Id.* M.G.'s cognitive functioning is average, and her judgment is age appropriate. *Id.* With respect to health and physical well-being, Drs. Randall and Prowda determined that M.G. has seizures that are controlled with medication. (*Id.* at 64.) Drs. Randall and Prowda weighed medical opinions, and came to the same conclusion as Dr. Khan, a consultative pediatric examiner, finding no gross physical limitations. (*Id.* at 65.) Great weight was assigned to Dr. Mahoney, a consultative psychiatric examiner, because his opinion is consistent with their opinion that "M.G. has the ability to attend to, follow, and understand age appropriate directions and complete age appropriate tasks, adequately maintain appropriate social behavior, and respond to changes in the environment." *Id.* Drs. Randall and Prowda also agreed with Dr. Mahoney's assessment that M.G. has a mild learning problem, but can still ask

questions and ask for help in an age-appropriate manner and "interact adequately with peers and interact adequately with adults." (Tr. at 65.)

### f. Dr. David Masur, Neuropsychologist

On September 24 and October 11, 2013, Dr. Vanessa D'Orio conducted a neurological assessment of M.G. under the supervision of Dr. David Masur. (*Id.* at 935-41.) Dr. Masur observed M.G. as being well-groomed and "neatly dressed, sweet, polite, and cooperative." (*Id.* at 935.) M.G.'s mood was cheerful and appropriate, she showed a great sense of humor, and she was able to respond appropriately to questioning. *Id.* M.G. did not have difficulties with comprehension, and there was no evidence of staring episodes or disengagement during the assessment. *Id.* M.G. was found to have a full scale IQ of 76 in the borderline range (5th percentile). (*Id.* at 936.) Her wording memory is borderline (6th percentile). *Id.*

Overall, M.G. was found to have "low intellectual functioning for her age" and "relative weakness in sustained attention and speed, and relatively stronger verbal knowledge and visual perceptual functions." (*Id.* at 937.) M.G. was also found to have an overall academic performance that was average for her age. (*Id.* at 941.) The assessment states that M.G. could benefit from medical management of ADHD, tutoring in math and other subjects (even though her performance on the evaluation was within normal limits for her age because of her slow processing speed), and increased time on tests. (*Id.* at 941.) The assessment indicated that M.G. could benefit from individual psychotherapy (since she reported significant anxiety) and occupational therapy (because she showed some slowing in speed and dexterity of her right hand compared to her left). *Id.*

### g. Dr. Sreedevi Chandrasekhar, Consultative Medical Expert

Dr. Sreedevi Chandrasekhar testified at the hearing on August 10, 2014. (*Id.* at 46.)

After reviewing M.G.'s most recent medical records from Montefiore Hospital, Dr. Chandrasekhar concluded that M.G.'s impairments did not meet the requirements for a finding of epilepsy under listing 111.03 of Appendix 1 of 20 CFR Part 404, Subpart P. (Tr. at 47-50.) However, Dr. Chandrasekhar concluded that M.G. had marked limitations in the domains of (1) acquiring and using information and (2) health and physical well-being; a less than marked limitation in attending and completing tasks; and no limitations in (1) interacting and relating with others, (2) moving about and manipulating objects, and (3) caring for herself. (*Id.* at 50-51.) Dr. Chandrasekhar formed this opinion by reviewing school reports in M.G.'s file, which indicated that M.G. was absent from school fifteen times in one school year, and is struggling in school. *Id.* In the domain of health and physical well-being, Dr. Chandrasekhar concluded that M.G. has a marked limitation because M.G. is diagnosed with epilepsy and wakes up at night with bizarre behavior. *Id.* Dr. Chandrasekhar also notes that Dr. Cherian increased M.G.'s dosage of Carbatrol, based on Martinez's concerns about M.G.'s behavior, including memory loss and staring unresponsively, despite Dr. Cherian finding no marked limitations during M.G.'s examination. (*Id.* at 411-13.)

### 3. Non-Medical Evidence

#### a. Statements by M.G.'s Teacher and Social Worker

On April 9, 2014, M.G.'s teacher Stephanie Gonzalez ("Gonzalez") completed a check box questionnaire, indicating that M.G. has marked limitations in acquiring and using information and attending and completing tasks. (*Id.* at 948-49.) Gonzalez found that M.G. had no limitations in the domains of interacting and relating with others, moving about and manipulating objects, and caring for herself. *Id.* The form was co-signed by Mercedes Rivera, LMSW. (*Id.* at 949.)

## C.    The Findings of ALJ Zachary Weiss

On May 2, 2014, ALJ Weiss issued a decision denying M.G.'s application for SSI. (Tr. at 42-58.) The ALJ applied a three-step sequential evaluation to make his determination. (*Id.* at 22.) ALJ Weiss determined that M.G., who was born on March 5, 2003, was a school-aged child on the date the SSI application was filed and at the time of the decision. *Id.* The ALJ found that M.G. has not engaged in substantial gainful activity since June 12, 2012, the date Martinez filed for SSI. *Id.* The ALJ found at step two that M.G. has the following severe impairments: epilepsy, ADHD, and asthma. *Id.* The impairments were found to be severe in that they cause more than a minimal limitation in M.G.'s ability to perform all age-related activities. *Id.*

At step three, the ALJ first found that M.G.'s impairments did not meet or medically equal any impairment in the listings in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* The ALJ then evaluated if M.G.'s impairments were functionally equivalent to a listed impairment. (*Id.* at 23-30.) The ALJ found that M.G. has less than marked limitations in acquiring and using information, attending and completing tasks, and health and physical well-being. *Id.* The ALJ also found that M.G. has no limitations in interacting and relating with others, moving about and manipulating objects, and caring for herself. *Id.* Thus, the ALJ found that M.G.'s impairments are not functionally equivalent to a listed impairment because M.G.'s impairments do not cause at least two marked limitations or one extreme limitation in the six functional domains. Therefore, M.G. is not disabled within the meaning of the Act. (*Id.* at 22-23.)

ALJ Weiss noted testimony from Martinez, stating that M.G. has severe headaches, loss of functioning in school, and loss of concentration. *Id.* Martinez's testimony also indicated that M.G.'s mediation has not helped her impairments. *Id.* Although the ALJ found that M.G.'s impairments could reasonably produce the alleged symptoms, ALJ Weiss did not find Martinez's

testimony about the persistence and limiting effects of M.G.'s symptoms entirely credible

because M.G.'s seizures and headaches were found to be dramatically improved upon taking

medication. (Tr. at 22-23.)

ALJ Weiss assigned great weight to consultative physicians Khan, Mahoney, Randall,

and Prowda. (*Id.* at 25.) He also assigned great weight to Dr. Masur. *Id.* These physicians

found that M.G.'s impairments were not disabling. *Id.* No weight was assigned to the opinion of

Dr. Chandrasekhar, because her opinion was inconsistent with the rest of the record. *Id.*

The following table summarizes ALJ Weiss's assessment of various treating and

consultative examiners:

| Physician | Relationship to Claimant | Weight | Assessment |
|---|---|---|---|
| Dr. Budd | Treating | Not assigned[1] | Normal check-ups |
| Dr. Cherian | Treating | Not assigned[2] | Unmarkable |
| Dr. Khan | Consultative | Great weight | No gross physical limitation |
| Dr. Mahoney | Consultative | Great weight | Generally well-behaved |
| Drs. Prowda and Randall | Consultative | Great weight | Mild to no impairments, age-appropriate behavior |
| Dr. Masur | Treating | Great weight | Low intellectual functioning, age-appropriate behavior |
| Dr. Chandrasekhar | Medical Expert | No weight | Marked limitations in two domains |

## D. Plaintiff's Request for Review by the Appeals Council

On July 1, 2014, Martinez requested review by the Appeals Council. (*Id.* at 8.) On

December 29, 2015, the request was denied. (*Id.* at 1-6.)

---

[1] Although the weight assigned to the opinions of M.G.'s treating physicians was not specifically stated, those opinions do not support a claim that M.G. is disabled under the Act.
[2] See footnote 1.

# III. DISCUSSION

## A. Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. §§ 405(g), 1383(c)(3). Therefore, a reviewing court does not determine *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (*per curiam*) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See e.g., Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair

record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008)

(overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

**B.    Determination of Disability**

**1.  Evaluation of Disability Claims**

Under the Act, every individual who is considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). Disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.* at § 423(d)(1)(A). The disability must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* at § 423(d)(2)(A).

The SSI program, codified under 42 U.S.C. § 1381c(a)(3)(C)(i), allows children under age eighteen to be considered medically disabled if the child has medically determinable physical or mental impairments that result in marked and severe functional limitations that can last up to at least twelve months.

To determine whether an individual under the age of eighteen qualifies for SSI, the Commissioner must conduct a three-step inquiry: (1) determine whether the claimant is engaged

in any substantial gainful activity; (2) determine whether the claimant has a "severe impairment" which significantly limits his ability to work; (3) if so, determine whether the impairment is one of the listings in the "Listing of Impairments" provided in 20 C.F.R. Part 404, Subpart P, Appendix 1, for which the Commissioner presumes disability. *See* 20 C.F.R. §§ 416.920(d), 416.925, and 416.926. To determine whether an impairment or combination of impairments equals the listings, the Commissioner must consider the claimant's ability in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. *See* 20 C.F.R. §§ 416.926(a)-(d). A medically determinable impairment functionally equals a listed impairment if it results in "marked" or "severe" limitation in two domains of functioning or an "extreme" limitation in one domain. *See* 20 C.F.R. § 416.926(a). Limitations will be considered "marked" when the impairment "interferes seriously with the child's ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926(a)(e)(2)(i).

## 2. The Treating Physician Rule

The SSA regulations require the Commissioner to evaluate every medical opinion received. *See* 20 C.F.R. § 404.1527(c); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative or non-examining physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("SSA regulations provide a very specific process for evaluating a treating physician's opinion and instruct ALJs to give such opinions 'controlling weight' in all but a limited range of circumstances.").

If the treating physician's opinion is not given controlling weight, the Commissioner must nevertheless determine what weight to give it by considering: (1) the length, nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) the specialization of the physician; and (5) any other relevant factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii); *Schisler,* 3 F.3d at 567-69. The Commissioner may rely on the opinions of other physicians, even non-examining ones, but the same factors must be weighed. 20 C.F.R. § 416.927(e).

The ALJ is required to explain the weight ultimately given to the opinion of a treating physician. See 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Greek*, 802 F.3d at 375 (citing *Burgess*, 537 F.3d at 129); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.,*

361 F. App'x. 197, 199-200 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

Furthermore, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record," especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician. *Burgess*, 537 F.3d at 129 (quoting *Rosa*, 168 F.3d at 79); *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) ("[A] proper application of the treating physician rule mandates that the ALJ assure that the claimant's medical record is comprehensive and complete."). Similarly, "if an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." *Hartnet v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998), *accord Rosa*, 168 F.3d at 79.

Finally, the ALJ must give advance notice to a *pro se* claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the *pro se* claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

### 3. The Commissioner's Duty to Develop the Record

The ALJ generally has an affirmative obligation to develop the administrative record. 20 C.F.R. § 404.1512(d); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security

proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). Under the Act, the ALJ must "make every reasonable effort to obtain from the individual's treating physician ... all medical evidence, including diagnostic tests, necessary in order to properly make" a determination of disability. 42 U.S.C. § 423(d)(5)(B). Furthermore, when the claimant is unrepresented by counsel, the ALJ "has a duty to probe scrupulously and conscientiously into and explore all relevant facts . . . and to ensure that the record is adequate to support his decision." *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999), citing *Dechirico v. Callahan*, 134 F.3d 1177, 1183 (2d Cir. 1998); *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996). Remand to the Commissioner is appropriate when there are "obvious gaps" in the record and the ALJ has failed to seek out additional information to fill those gaps. *See Lopez v. Comm'r of Soc. Sec.*, 622 F. App'x. 59 (2d Cir. N.Y. 2015), citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

## C.    Issues on Appeal

On appeal, Martinez argues that the case should be remanded to the Commissioner because (1) the ALJ failed to properly evaluate Martinez's credibility;[3] (2) substantial evidence does not support the ALJ's findings that M.G. has a less than marked limitation in the categories of (a) acquiring and using information, (b) attending and completing tasks, and (c) health and well-being; (3) the ALJ committed legal error when he gave controlling weight to the opinions of the state agency non-examining doctor and two consulting physicians; (4) the ALJ erred in assigning no weight to M.G.'s teacher, the New York City Public Schools Individual Attendance Report, and M.G.'s report cards; and (5) the ALJ committed legal error when he gave no weight

---

[3] Although this argument was not specifically raised in Plaintiff's Motion for Judgment on the Pleadings, it was raised to the Appeals Council (Tr. at 10-11.) and will be addressed below.

to impartial medical expert, Dr. Chandrasekhar. (Pl.'s Mem. at 2.) The Commissioner maintains that ALJ Weiss applied the correct legal principles in reaching his decision and that the decision is supported by substantial evidence. (Def.'s Mem. at 2.)

### 1. The ALJ Properly Assessed Martinez's Credibility

The Commissioner is required to consider the claimant's statements regarding her subjective level of pain and other symptoms, but this alone will not establish disability. 20 C.F.R. § 404.1529(a). Medical findings must support the conclusion that the claimant suffers from an impairment which could "reasonably be expected to produce the pain or other symptoms alleged by the claimant, and which, when considered with all other evidence, would lead to the conclusion that the individual is under a disability." 42 U.S.C. § 423(d)(5)(A); *see also* 20 C.F.R. §§ 404.1529, 416.929.

The ALJ, not the reviewing court, is tasked with resolving evidentiary conflicts and appraising the credibility of witnesses, including the severity of a claimant's alleged symptoms. *Cichocki v. Astrue*, 534 F. App'x. 71, 75 (2d Cir. 2013) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). The ALJ may reject claims of severe and disabling pain after weighing medical evidence in the record, the claimant's demeanor, and other indicia of credibility. *See* Soc. Sec. Rul. 96–7p (S.S.A), 1996 WL 374186 (July 2, 1996); *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591-92 (2d Cir. 1984). The ALJ, however, must give reasons "with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." *Echevarria v. Apfel*, 1999 U.S. Dist. LEXIS 5545, *23, 60 Soc. Sec. Rep. Service 801 (S.D.N.Y. Mar. 18, 1999) (citing *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).) "If a claimant's symptoms suggest a greater impairment than can be shown by objective evidence alone, other factors should be considered."

*Echevarria*, 1999 U.S. Dist. LEXIS 5545 at *22. These factors can include: "(1) the person's daily activities; (2) the location, duration, frequency, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and adverse side effects of medication that the person has taken to alleviate the symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; and (6) any measures which the person uses or has used to relieve the pain or other symptoms." *Id.* (citing 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).)

Even though Martinez testified on M.G.'s behalf, the same credibility standard applies. *Hamedallah ex rel. E.B. v. Astrue*, 876 F. Supp. 2d 133, 152 (N.D.N.Y 2012) (citing *Jefferson v. Barnhart*, 64 F. App'x. 136, 140 (10th Cir. 2003)). "If the child claimant is unable adequately to describe [her] symptoms, the ALJ must accept the description provided by testimony of the person most familiar with the child's condition, such as a parent." *Id.*

Although ALJ Weiss found that M.G.'s medically determinable impairments could reasonably have been expected to cause the alleged symptoms, the ALJ found Martinez's testimony of the alleged intensity, persistence, duration, and impact on functioning not credible or consistent with the totality of the evidence. (Tr. at 60.) ALJ Weiss found Martinez's testimony not entirely credible because M.G.'s records indicated "a longitudinal, yet overall successful history of treatment for her impairments." (*Id.* at 24.) Martinez testified that M.G.'s seizures leave her in a state of confusion with a loss of concentration and difficulty performing tasks. *Id.* Martinez also stated that M.G. has other limitations, which include bed-wetting, auditory hallucinations, overeating, and acting immaturely or inappropriately. *Id.* ALJ Weiss found, however, that the evidence demonstrates that M.G. remained symptom free with improved headaches for over a year, "with headaches and testing both proving normal." *Id.*

Martinez maintains that M.G. "is violent and defiant, often fighting with peers and parents." (Tr. at 24.) ALJ Weiss found that M.G. is described by various medical examiners as "sweet," "polite," and "cooperative with mental examinations" and that she had "good eye contact, good language skills, and normal thoughts." *Id.*

The ALJ also cites Dr. Mahoney's examination that found that M.G. is "fully capable of performing tasks with normal thought processes, and intact memory," despite Martinez's testimony that M.G. loses functioning and concentration in school. *Id.* ALJ Weiss also notes that while M.G. does struggle with math, her performance in other subjects is appropriate and has improved since her treatment for seizures began. *Id.* In response to Martinez's reports of severe limitations caused by ADHD and asthma, ALJ Weiss notes that various medical reports show no wheezing or irregular chest sounds. *Id.*

## 2. The ALJ's Assessment of M.G.'s Impairments Are Supported by Substantial Evidence

### a. Acquiring and Using Information

There is substantial evidence to support the ALJ's finding that M.G. has a less than marked limitation in acquiring and using information. (*Id.* at 25-26.) This domain includes the child's ability to acquire or learn information, and includes the child's ability to use the information she has learned. 20 C.F.R 426.926(a)(g); SSR 09-03p, 2009 WL 396025 at *2 (Feb. 17, 2009).

M.G. was evaluated by Dr. Masur, where tests revealed that M.G.'s overall academic performance was average for her age, despite intellectual functioning in the borderline range. (Tr. at 26, 937, 941.) Dr. Mahoney, a psychiatric consultative examiner, also found that M.G. has "a mild learning problem" that "did not seem to interfere with [her] ability to function on a daily basis." (*Id.* at 391.) ALJ Weiss also considered the opinions of Drs. Randall and Prowda,

20

whose testing showed intact visual and verbal memory, and intact language skills. (Tr. at 26.) Medical opinions of state agency medical consultants can constitute substantial evidence in support of the ALJ's findings. See *Fyre ex rel. A.O v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012); *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (the opinion of a non-examining consultant may constitute substantial evidence where it is consistent with the record as a whole).

The ALJ gave no weight to the opinion of Dr. Chandraskhar, a consultative medical expert, who found that M.G. had a marked limitation in this domain, because her opinion was not well-supported and was inconsistent with other opinions in the record. (*Id.* at 25.)

b.   **Attending and Completing Tasks**

There is substantial evidence to support the ALJ's finding that M.G. had less than marked limitations in attending and completing tasks, which is the domain that evaluates a child's ability to focus and maintain attention. This domain also evaluates the ability to begin, carry through, and finish activities, including the mental pace at which she performs activities and the ease of changing activities. 20 C.F.R 416.926a(h); SSR 09-4p, 2009 WL 396033 at *4 (Feb. 18, 2009). ALJ Weiss based his determination on the opinion of medical examiners and providers. (Tr. at 27.) Dr. Mahoney found that M.G. was "mildly limited" in terms of her attention and concentration. (*Id.* at 391.) Additionally, Dr. Mahoney found that M.G. can count backwards from 10 to 0, and was able to recall three out of three objects after five minutes. *Id.* Drs. Randall and Prowda also found that M.G. had a less-than-marked limitation in this area. (*Id.* at 64.)

c.   **Health and Physical Well-Being**

There is substantial evidence to support the ALJ's finding that M.G. has less than marked limitations in health and physical well-being, which considers the cumulative physical effects of

physical and mental impairments and any associated treatments or therapies on a child's health and functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects. (Tr. at 25); *see* 20 C.F.R 416.926a(1); SSR 09-8p, 2009 WL 396030 at *2 (Feb. 17, 2009). Accordingly, the ALJ gave no weight to the opinion of Dr. Chandrasekhar who found a marked limitation in this domain, since her opinion was inconsistent with substantial evidence on the record. (Tr. at 25.) ALJ Weiss noted that M.G.'s physical examinations showed no issues with asthma, noting normal findings, with no wheezing, rales, or ronchi. (*Id.* at 449, 452-53, 495, 501, 508.) Physical examinations and check-ups performed by both consultative examiners and M.G.'s treating physician, Dr. Budd, all reported normal findings. (*Id.* at 449, 453, 460, 467-68, 484-85, 493, 930.) Consultative examiner Dr. Khan performed a physical examination on M.G. and found that, despite having a history of seizures, M.G. had "no gross physical limitation to participate in educational, social, or recreational activities." (*Id.* at 400.)

### 3. The ALJ Did Not Err in Assigning "Great Weight" to Consulting Physicians

The ALJ gave great weight to the reports of the Drs. Mahoney and Khan, SSA consulting doctors, and Drs. Randall and Prowda, non-examining State Agency examiners. (*Id.* at 25.) M.G. maintains that the ALJ committed legal error by giving these opinions "controlling" weight. (Pl.'s Mem. at 20-22.) Controlling weight can only be used to characterize the evidence from treating sources. *See* 20 C.F.R 416.927(c)(2). ALJ Weiss clearly assigns these sources "great weight," not "controlling weight." (Tr. at 25.) ("the undersigned assigns great weight to Dr. Khan[] ... great weight is afforded to Dr. Mahoney ... great weight is afforded to Dr. Prowda.")

ALJ Weiss had the authority to assign great weight to consultative examiners. *Fyre ex rel. A.O*, 485 F. App'x at 487; *Lamond v. Astrue*, 440 F. App'x 17, 20 (2d Cir. 2011) (The medical opinions of State agency medical consultants can constitute substantial evidence in support of the ALJ's findings). Additionally, ALJ Weiss assigned "limited weight" to a portion of the opinions of Drs. Prowda and Randall, when ALJ Weiss found that M.G. has "no limitations" in interacting with others and caring for herself. (Tr. at 25.)

### 4. The ALJ Did Not Err in Assigning No Weight to Non-Medical Sources

The same factors applied when considering the opinions of medical sources are applied when considering non-medical source opinions, however, the application of the factors may vary depending on the facts of the case. 20 C.F.R. § 416.927(f)(1). "While the opinions of educators and other non-medical sources are not entitled to controlling weight under the regulations, they are, nevertheless, deemed valuable sources of evidence in assessing impairment severity and functioning and should be considered by the ALJ." *Reid v. Astrue*, No. 07-CV-577, 2010 WL 2594611, at *5, n. 4 (N.D.N.Y. June 23, 2010).

On April 9, 2014, M.G.'s fifth grade teacher filled out a check box questionnaire, where she indicated that M.G. has marked limitations in (1) acquiring and using information and (2) attending and completing tasks. (Tr. 948-49.) M.G. argues that the ALJ failed to weigh the opinion of the teacher because the ALJ failed to acknowledge the questionnaire, as well as the New York City Public Schools Individual Student Attendance Report dated April 7, 2014, which showed fifteen absences during the 2013-2014 school year and nineteen absences during the 2012-2013 school year. (Tr. at 343.) The ALJ states that his decision was made after considering all evidence on the record. (*Id.* at 19.) The ALJ is not required to discuss every piece of evidence submitted and his failure to cite specific evidence does not indicate that the

evidence was not considered. *Brault v. Social Security Admin Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). Additionally, the the questionnaire was not accompanied with an explanation or supporting evidence and is not consistent with M.G.'s record as a whole.

The opinion of a non-medical source "may outweigh the opinion from a medical source," when considering the length of relationship, supporting evidence, explanations, and consistency with the record. 20 C.F.R. § 416.927(f)(1). The questionnaire here can be described as "only marginally useful" and "weak evidence at best." *Halloran v. Barnhart*, 362 F.3d 28, 31 n.2 (2d Cir. 2004) (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)) (A standardized form which was limited to four check-in box responses were found to be "marginally useful"). An ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. § 416.927(f)(2). The questionnaire would not have altered the outcome of the case because it lacked detail and consistency with the record as a whole. The ALJ, therefore, was not required to assign specific weight to the opinion. The same reasoning applies to the Attendance Reports and report cards entered into evidence.

### 5. The ALJ Did Not Err in Assigning No Weight to Dr. Chandrasekhar

ALJ Weiss assigned no weight to the opinion of Dr. Chandrasekhar because she was not given the opportunity to evaluate the neuropsychological examination conducted by Dr. Masur, which showed that M.G. had greater capabilities than Dr. Chandrasekhar evaluated. (Tr. at 25.) Dr. Chandrasekhar evaluated EEG reports from Montefiore hospital, under M.G.'s treating neurologist, Dr. Cherian. (*Id.* at 47.) After reviewing the most recent medical records from Dr. Cherian, Dr. Chandrasekhar concluded that M.G.'s impairments did not meet the requirements

for a finding of epilepsy under Listing 111.03 of Appendix 1 of 20 CFR Part 404, Subpart P. (Tr. at 47-50.) She did, however, find that M.G. had marked limitations in the domains of (1) acquiring and using information and (2) health and well-being; a less than marked limitation in attending and completing tasks; and no limitation in (1) interacting and relating to others, (2) moving about and manipulating objects, and (3) caring for herself. (*Id.* at 50-51.) When weighing medical opinions, "[t]here is no question that the ALJ retains discretion in deciding how to weight medical opinions." *Friedman v. Astrue*, No. 07 Civ 3651 (NRB), 2008 WL 3861211, at *9 (S.D.N.Y. Aug. 19, 2008) (citing 20 C.F.R § 404.1527(d)). The ALJ should, however, provide satisfactory explanations for the weight assigned to medical opinions. *See Clark v. Comm'r of Social Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

ALJ Weiss provided appropriate reasoning for not giving the opinion of Dr. Chandrasekhar any weight: Dr. Chandrasekhar did not review all of the medical evidence and her opinion was not consistent with other opinions on the record. (Tr. at 25); *see* 20 C.F.R 416.927(c)(3)(4) (supportability and consistency are factors on assigning weight to medical source opinion evidence). Dr. Chandrasekhar determined that M.G. had a marked limitation in acquiring and using information based on school reports that show that M.G. is struggling in school. (Tr. at 50-51.) Dr. Chandrasekhar also found a marked limitation in health and well-being based on M.G.'s epilepsy diagnosis, and an increased dosage of Carbatrol. (*Id.* at 52.) Dr. Chandrasekhar made her decision without the opportunity to review Dr. Masur's neuropsychological examination, because it was handed to her the day of the hearing by Martinez's attorney. (*Id.* at 45.) The opinion therefore was "based on incomplete information" and not well-supported by the record. *Id.* at 25; *see* 20 C.F.R 416.927(e)(2)(iii). However, even if Dr. Chandrasekhar had had the opportunity to review the neuropsychological examination, her

opinion was still inconsistent with the opinion of every other medical opinion on the record, including the opinions of Dr. Mahoney and Drs. J. Randall and K. Prowda. (Tr. at 25, 63-64, 391.)

## IV. CONCLUSION

For the reasons set forth above, I recommend that Martinez's motion be **DENIED** and the Commissioner's motion be **GRANTED.**

The Parties shall have fourteen days (14) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C)(mail), (D)(leaving with the clerk), or (F)(other means consented by the parties)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2).

Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable P. Kevin Castel, 500 Pearl Street, Room 1020, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 1970, New York, New York 10007. Failure to file timely objections shall constitute a waiver of those objections in both the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 149-50 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1)(c) (2009); Fed. R. Civ. P. 72(a), 6(a), 6(d).

**DATED: August 25, 2017**
**New York, New York**

Respectfully Submitted,

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**